IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

FRED M. LOMANGINO, et al.,

           Plaintiffs,

v.                                                CIVIL ACTION NO.   2:21-cv-00501

POLARIS INDUSTRIES INC., et al.,

           Defendants.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed *Polaris' Motion for Partial Summary Judgment on Plaintiffs' Breach of Implied Warranty of Merchantability and Breach of Implied Warranty of Fitness for a Particular Purpose* (Document 88), *Polaris' Memorandum of Law in Support of Its Motion for Partial Summary Judgment on Plaintiffs' Breach of Implied Warranty of Merchantability and Breach of Implied Warranty of Fitness for a Particular Purpose* (Document 89), the *Plaintiffs' Response in Opposition to Polaris' Motion for Partial Summary Judgment on Plaintiffs' Claims for Breach of Implied Warranty of Merchantability and Breach of Implied Warranty of Fitness for a Particular Purpose* (Document 106), and *Polaris' Reply in Support of Its Motion for Partial Summary Judgment on Plaintiffs' Breach of Implied Warranties Claims* (Document 114), as well as all exhibits.

The Court has also reviewed *Polaris' Motion for Partial Summary Judgment on Plaintiffs' Punitive Damages Claim* (Document 90), *Polaris' Memorandum of Law in Support of Its Motion for Partial Summary Judgment on Plaintiffs' Punitive Damages Claim* (Document 91), the

*Plaintiffs' Response in Opposition to Polaris' Motion for Partial Summary Judgment on Plaintiffs' Punitive Damages Claim* (Document 103), and *Polaris' Reply in Support of Its Motion for Partial Summary Judgment on Plaintiffs' Punitive Damages Claim* (Document 115), as well as all exhibits.

## FACTS

The Plaintiffs, Fred M. Lomangino, individually and as the parent and legal guardian of F.L., and Charles Lomangino (collectively, the Lomanginos), initiated this action with a *Complaint* (Document 1) filed on September 7, 2021. The Defendants are Polaris Industries Inc. and Polaris Inc. (collectively, Polaris). The claims relate to an October 9, 2020 accident in which the Plaintiffs suffered injuries when they crashed in their 2018 Polaris RZR UTV (utility terrain vehicle). The Complaint contains the following causes of action: Count One – Strict Liability as to Polaris Industries; Count Two – Strict Liability as to Polaris, Inc; Count Three – Negligence as to Polaris Industries; Count Four – Negligence as to Defendant Polaris, Inc.; Count Five – Breach of Warranties as to Defendant Polaris Industries; and Count Six – Breach of Warranties as to Defendant Polaris, Inc.[1] They seek relief including damages for medical bills, physical injuries, emotional distress, loss of income, other compensatory damages, punitive and exemplary damages, civil penalties, property damage, attorney's fees and costs, and pre-and post-judgment interest.

Fred Lomangino purchased a used 2018 Polaris RZR with approximately 20 hours of driving time for $18,000, adding to an extensive collection of recreational vehicles. He and his family members were experienced riders and took frequent trips to ride on trails. In October 2020,

---

[1] In their response to the motion for partial summary judgment on the breach of implied warranty of merchantability and breach of implied warranty of fitness for a particular purpose, the Plaintiffs withdrew their claim for breach of the implied warranty of fitness for a particular purpose. The Court will therefore not address that claim further, and it will be dismissed.

2

the Plaintiffs, along with a group of other friends and family members, traveled from their homes in New York and New Jersey to ride on the Hatfield-McCoy trail system.  The Lomanginos had taken similar trips in the past and had some familiarity with the trail system.  On October 9, 2020, they began riding at around 11:30 a.m. or 12:00 p.m.  Fred was operating the RZR, Charles was in the front seat, and F.L. was in the rear seat.  They were all wearing helmets.  The weather was clear.  Fred planned to stay on the relatively easy trails marked green and blue.

At around 2:00 p.m., they were travelling on a wide trail, in the middle of their party, with vehicles both in front and behind the RZR.  Fred recalled that it was a bit dusty, and they were on a slight downgrade when they encountered a shelf or a drop in the trail.  "[T]he two machines in front of me went right over it no problem.  The girls behind me came right over it no problem." (F. Lomangino Depo. at 55::20-22) (Document 88-1.)  He estimated that he was driving about 20 miles per hour at the time, and he may have tapped the brakes as he approached the drop.  F.L. confirmed that they were cruising at a fairly constant, low speed.  However, after they went over the drop, the RZR hit the ground on the trail, which had gouge marks 15.8 yards from the drop, and summersaulted end over end before finally landing on its wheels.  Charles was on the ground outside the vehicle, unconscious, with severe injuries.  F.L. remained in the backseat with significant injuries.  Fred remained in his seat with no significant injuries.  After checking on his son and determining his injuries were not life-threatening, he helped tend to Charles while awaiting EMS.  He also noted that the A-arm or control arm on the RZR was bent and damaged.

An investigating officer, Ping-Heng Lee, responded to the accident scene and completed a crash report.  (Hatfield McCoy Trails ATV Crash Report) (Document 88-3.)  The report notes that it was a clear, dry day, and the crash occurred on a straight and graded section of the dirt trail.

Officer Lee checked a box indicating that a failure to maintain control contributed to the accident but did not indicate that the driver exceeded a safe speed. In the narrative section of the report, Officer Lee indicated that "[t]he accident was likely caused from the combination of the following factors: dry conditions obscuring [Fred Lomangino's] view of the Trail, [Fred Lomangino's lack of experience riding the Hatfield-McCoy Bearwallow Trail, and [his] use of brakes while coming down the hill." (Crash Report at 5.) The report notes that Charles was not wearing a seatbelt, which caused him to be ejected from the vehicle, as well as referencing the possibility that he intentionally jumped from the vehicle during the crash due to his experience riding bikes and ATVs.[2]

The Plaintiffs' expert, Dr. Marc Zupan, conducted an analysis of the RZR following the accident. (Zupan Rep.) (Document 88-6.) He reached the following conclusions:

> 1. The failed subject lower control arm suffered from manufacturing flaws resulting in a product that was not reasonably safe for the intended and anticipated use.
> 2. When benchmarked to the industry, the subject vehicle's lower control arm is substandard; the subject lower control arm is not equivalent to other available 2018 lower control arms and the materials selection in solid mechanics design embodiment is not reasonably safe for the intended and anticipated use.
> 3. Polaris' failure to adopt other 2018 available lower control arm best practices and state-of-the-art designs, including their own designs, resulted in a lower control arm on the subject vehicle that was not reasonably safe for the intended and anticipated use.
> 4. The manufacturing flaws in the subject lower control arm and deficient design resulted in diminished mechanics of materials performance and are the proximate cause of the subject lower control arm failure and the crash.
> 5. The subject lower control arm failed without warning in a single event.

---

2 The Court notes that there is a pending motion in limine related to the admissibility of evidence regarding Charles Lomangino's failure to wear a seatbelt. The inclusion of the information herein is not intended to resolve its admissibility.

4

> 6. The record, the data collected from the subject vehicle, and analytical crash site analysis determined that at the time of the crash, the subject vehicle was being operated under anticipated and expected conditions for the subject vehicle.
> 7. The totality of the investigation, including but not limited, to the observations on the physical evidence, materials testing, inspections, and analysis of the subject, as well as exemplar lower control arms, benchmarking, and review of the scientific literature, conclude that the material selection, manufacturing, and solid mechanics embodiment of that the lower control arm utilized on the subject vehicle is not reasonably safe for the intended and anticipated use on the subject vehicle.
> 8. The totality of the investigation concludes that if any of the other lower control arms reviewed and analyzed as part of this investigation, other than the subject lower control arm design, were utilized on the subject vehicle, the crash would not have happened.
> 9. The subject Polaris lower control arm failed from normal anticipated and foreseeable use. Solid mechanics and materials analysis, design-led materials selection review, concludes that the subject lower control arm solid mechanics embodiment and materials selection is of substandard merits; the consequence of the Polaris inferior design, lack of performance analysis, lack of component testing, lack of design evaluation, and material manufacturing is that the subject lower control arm is unsafe for its intended use and application.

(Zupan Rep. at 2-3.) Dr. Zupan identified manufacturing defects in the welds that impacted the performance of the lower A-arm. In addition to the welds, he noted a failure in a tube on the control arm that "occurred when the tube material strength was overcome." (Zupan Rep. at 30.) He further found that the design was not reasonably safe for the intended and anticipated use and was inferior to other lower control arms in use in 2018, including other designs used by Polaris.

The Defendants' materials expert, Dr. Bastiaan Cornelissen, also performed testing on the RZR. He concluded that the tensile properties of the lower control arms exceeded Polaris's minimum requirements. He found no significant abnormalities or deficiencies in the welds. Dr. Cornelissen opined that "Both the macroscopic and microscopic characteristics of the fractures in

the subject driver's side lower control arm are characteristic of a massive mechanical overload condition.  The presence of four separate fracture locations in a single welded steel component points to an overload condition rather than the presence of a welding flaw or other imperfection as the cause of the failure of the control arm."  (Cornelissen Rep. at 32) (Document 90-10.)   He also found that the evidence supported a conclusion that the damage to the control arm occurred near the end of the crash sequence when the vehicle reached its final resting point, rather than at first contact with the ground.

The Defendants' accident reconstruction experts, Kevin and Casey Breen, submitted a report analyzing evidence surrounding the crash.  Their report indicates that the distance the RZR travelled between the drop and an area of gouged dirt in the track that signifies the initial contact point would require a speed in the mid-40 mph range.[3]   (Breen Rep. at 13) (Document 88-8.)  After hitting the drop in the trail and going airborne, the RZR impacted the trail nose-down, and rotated "in a forward pitch motion with a slight driver's side bias." (Breen Rep. at 15.)  The vehicle then rotated 360 degrees, landing on its wheels.  The Breen report opines that the damage to the lower A-arm occurred at the final ground contact, rather than at the initial contact, as stated in the Zupan report.  In tests of an exemplar vehicle on the same section of trail, the RZR did not lose contact with the ground at speeds up to 30 mph.  The Breen report concludes that Fred Lomangino's operation of the vehicle caused the loss of control and the overturn, and "[t]he fact that the lower control arm sustained a fracture or failure is a direct consequence of the crash that included a high-speed jump and did not initiate the loss of control."  (Breen Rep. at 18.)

---

3 This speed estimate is inconsistent with the speed estimates given by the Plaintiffs and their expert, who opined that a speed of approximately 20 mph was supported by the evidence at the crash scene.

In addition to the expert evidence, the Plaintiffs provided several warranty claims related to weakness or failure of the lower A-arms. Polaris also completed a study on September 9, 2022, entitled "Suspension Buckling Benchmarking Champ Front Suspension," (Buckling Study) that recognized the risk of the lower A-arms buckling.

As is detailed elsewhere in the record, Polaris failed to timely produce certain requested discovery materials, including the warranty reports and the Buckling Study. Thus, some discovery was made available to the Plaintiffs shortly before or after responses to the motions for summary judgment were due and could not be fully incorporated into expert reports. Nonetheless, the Court finds that the status of the evidence permits resolution of the motions without further briefing.

## STANDARD OF REVIEW

The well-established standard in consideration of a motion for summary judgment is that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)–(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014). A "material fact" is a fact that could affect the outcome of the case. *Anderson*, 477 U.S. at 248; *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). A "genuine issue" concerning a material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013); *News & Observer*, 597 F.3d at 576.

The moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322–23. When determining whether summary judgment is appropriate, a court must view all of the factual evidence, and any reasonable inferences to be drawn therefrom, in the light most favorable to the nonmoving party. *Hoschar*, 739 F.3d at 169. However, the nonmoving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. "At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action." *Perry v. Kappos*, No.11-1476, 2012 WL 2130908, at *3 (4th Cir. June 13, 2012) (unpublished decision) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249, nor will it make determinations of credibility. *N. Am. Precast, Inc. v. Gen. Cas. Co. of Wis.*, 2008 WL 906334, *3 (S.D. W. Va. Mar. 31, 2008) (Copenhaver, J.) (citing *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986). If disputes over a material fact exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson*, 477 U.S. at 250. If, however, the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment should be granted because "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23.

## DISCUSSION[4]

### A. Implied Warranty of Merchantability

Polaris contends that it is entitled to summary judgment as to the claim of breach of an implied warranty of merchantability. It argues that the Plaintiffs used the RZR without incident for several weekends prior to the accident, demonstrating its fitness for ordinary use. It notes that the Plaintiffs' expert did not identify "standards or regulations with which the RZR failed to comply," and that its own experts opine that "the RZR was of a serviceable quality and violated no standards." (Def. Mem. at 12.) It contends that the macroetching testing that the Plaintiffs' identify as required by Polaris' own internal standards was not in effect at the time the Plaintiffs' RZR was manufactured. Polaris further references the warning labels both on the RZR and in the Owner's Manual related to wearing seatbelts and helmets and avoiding reckless or careless driving, and argues that the accident and injuries were caused by the Plaintiffs' failure to comply with those warnings. Polaris contends that the Plaintiffs' expert's opinions regarding design and manufacturing defects are not sufficient to support a claim for breach of the implied warranty of merchantability.

The Plaintiffs contend that Fred Lomangino was not driving recklessly, and "the crash at issue in this case was caused by both design and manufacturing defects in the lower A-arms installed on the front driver's side of the Subject ATV." (Pl. Resp. at 6.) They argue that Polaris did not follow its own welding standards and neglected to perform testing required by those

---

4 The Court notes that both parties devoted a significant portion of their briefs to debating (a) whether the Plaintiffs operated the RZR at an excessive speed, a matter only tangentially related to the asserted breach of the warranty of merchantability, and (b) Charles Lomangino's failure to wear a seatbelt, a matter wholly irrelevant to either motion. Somewhat more concerted focus on the evidence relevant to the elements of the claims at issue would ensure that briefing serves its purpose of arguing the issues and informing the Court as to the status of the evidence.

standards. They cite their expert's findings, based on numerous tests, that the lower A-arms were defectively manufactured and designed. They also contend that Polaris was aware of the design flaws, citing a study completed by Polaris in September 2022. In short, they argue that the RZR "was not fit for the ordinary purposes for which ATVs are used: i.e., driving on off-road trails." (Pl. Resp. at 12.)

Under West Virginia law, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." W. Va. Code § 46-2-314(1). The implied warranty of merchantability requires, *inter alia*, that goods be "fit for the ordinary purposes for which such goods are used." *Id*. at § 46-2-314(2)(c). The proof applicable to strict products liability claims and implied warranty claims is "essentially coextensive." *Knight v. Boehringer Ingelheim Pharms., Inc.*, 323 F. Supp. 3d 809, 835 (S.D.W. Va. 2018) (Chambers, J) (citing *Keffer v. Wyeth*, 791 F. Supp. 2d 539, 544 (S.D.W. Va. 2011) (Copenhaver, J.)).

Polaris does not contest that the ordinary purposes for which the RZR is used includes driving on off-road trails, such as the Hatfield-McCoy trail system. There is also no dispute that the RZR crashed on the trail, and that the lower A-arm was among the damage to the UTV following the crash. The Plaintiffs have presented sufficient evidence to permit a jury, resolving factual disputes in their favor, to conclude that their ride was within the range of ordinary usage. They were riding in a train with various ATVs, and others in the group went over the same section of trail at approximately the same speed, seconds before, without incident. The Plaintiffs also have presented expert evidence that defects in the design and manufacture of the lower A-arm assembly caused the crash. While Polaris has presented contrary expert evidence, the Court

cannot resolve the credibility of the conflicting expert opinions. A jury crediting the Plaintiffs' expert could find that the RZR was not fit for the ordinary purposes for which such vehicles are used due to the design and manufacturing defects. Therefore, the Defendants' motion for summary judgment as to the implied warranty of merchantability claim must be denied.

### B. Punitive Damages

Polaris argues that the Plaintiffs have not put forward evidence to support a punitive damages claim. As it argued with respect to the implied warranty of merchantability claim, Polaris contends that the accident was caused by Fred Lomangino driving recklessly, and Charles Lomangino's injuries were largely caused by his failure to wear a seatbelt. Polaris further argues that the Plaintiffs have not presented evidence that it acted in an outrageous manner or with actual malice. It contends that it complied with all applicable industry standards and conducted thorough testing on the RZR. In sum, it argues that there "is no evidence that Polaris had any knowledge of any defect, failed to warn customers, or consciously disregarded any information that would warrant an award of punitive damages." (Def. Mem. at 17.)

The Plaintiffs argue that they have produced evidence that the lower A-arm was defectively manufactured and designed, and that the defective product caused the crash. They contend that Polaris has not produced results for tests that its own standards required. The Plaintiffs further argue that Polaris was aware of problems with the lower A-arms based on warranty claims, and the neglected testing would have provided even earlier notice of the issue. They note that other designs were available and in use at the time the RZR was manufactured, including safer designs used on other Polaris ATVs. Thus, they contend that the evidence is sufficient to permit a

11

reasonable juror to "conclude that Polaris' acts and omissions show a conscious, reckless and outrageous indifference to the health, safety and welfare of others." (Pl. Resp. at 14.)

Under West Virginia law, "[a]n award of punitive damages may only occur in a civil action against a defendant if a plaintiff establishes by clear and convincing evidence that the damages suffered were the result of the conduct that was carried out by the defendant with actual malice toward the plaintiff or a conscious, reckless and outrageous indifference to the health, safety and welfare of others." W. Va. Code § 55-7-29(a); *Jordan v. Jenkins*, 859 S.E.2d 700, 707 (W. Va. 2021). "In products liability cases, the plaintiff may justify a punitive damages award by showing that the manufacturer, having actual or constructive knowledge of the product defect, continued to manufacture and distribute it." *Eskridge v. Pac. Cycle, Inc.*, 556 F. App'x 182, 192 (4th Cir. 2014). Further, the West Virginia Supreme Court has established the following factors for consideration:

> The jury may consider (although the court need not specifically instruct on each element if doing so would be unfairly prejudicial to the defendant), the reprehensibility of the defendant's conduct. The jury should take into account how long the defendant continued in his actions, whether he was aware his actions were causing or were likely to cause harm, whether he attempted to conceal or cover up his actions or the harm caused by them, whether/how often the defendant engaged in similar conduct in the past, and whether the defendant made reasonable efforts to make amends by offering a fair and prompt settlement for the actual harm caused once his liability became clear to him.

*Jordan v. Jenkins*, Syl. Pt. 2, 859 S.E.2d 700, 707 (W. Va. 2021).

The Plaintiffs have presented evidence that the RZR had design and manufacturing flaws that rendered it dangerous for normal usage as an off-road recreational vehicle. They also have presented evidence that these flaws could be discovered through routine testing, that Polaris received warranty claims related to the lower A-arms, and that Polaris produced other vehicles

during the same time frame that used safer lower A-arm designs. Although discovery and sanctions disputes remain ongoing, the Plaintiffs have presented evidence that Polaris may have made an effort to cover up or conceal evidence favorable to the Plaintiffs. The Court finds that the Plaintiffs have presented sufficient evidence to permit a jury to find, by clear and convincing evidence, that punitive damages are warranted. Therefore, the motion for summary judgment as to punitive damages will be denied.

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that *Polaris' Motion for Partial Summary Judgment on Plaintiffs' Breach of Implied Warranty of Merchantability and Breach of Implied Warranty of Fitness for a Particular Purpose* (Document 88) and *Polaris' Motion for Partial Summary Judgment on Plaintiffs' Punitive Damages Claim* (Document 90) be **DENIED**. The Court further **ORDERS** that the Plaintiff's claim for breach of the implied warranty of fitness for a particular purpose be **DISMISSED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER: May 11, 2023

*/s/ Irene C. Berger*
IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA